**CAITHNESS RICA LIMITED PARTNERSHIP, Newbay Corporation, and Rhode Island Cogeneration Associates, L.P.,**

v.

**James J. MALACHOWSKI et al.**

**No. 92–276–M.P.**

Supreme Court of Rhode Island.

Jan. 27, 1993.

Robert Pitassi, Pitassi & Igoe, Providence, Douglas Nordlinger, Washington, D.C., for plaintiffs.

R. Daniel Prentiss, Providence, Richard Riendeau, Pawtucket, Robert Kiernan, Warwick, Michael Rubin, Office of the Atty. Gen., for defendants.

## OPINION

FAY, Chief Justice.

The petitioners, Caithness RICA Limited Partnership, Newbay Corporation, and Rhode Island Cogeneration Associates, L.P. (collectively Newbay), have filed a petition for certiorari pursuant to G.L.1956 (1988 Reenactment) § 42–98–12 and G.L.1956 (1990 Reenactment) § 39–5–2 to review a Report and Order of the Energy Facility Siting Board (EFSB). On May 15, 1992, the EFSB ruled that it has jurisdiction over Newbay's proposed coal-fired cogeneration facility (facility) and ordered Newbay to submit a licensing application to the EFSB. Newbay raises seven specifications of error in support of its claim that the EFSB wrongly assumed jurisdiction over Newbay's proposed facility. For the reasons stated herein, we find that the EFSB incorrectly determined that the facility satisfied its jurisdictional threshold.

In 1988 the General Assembly created a procedure governing the siting of major

energy facilities in Rhode Island. As codified in G.L.1956 (1988 Reenactment) chapter 98 of title 42, the Energy Facility Siting Act (siting act) delineated two mutually exclusive licensing paths for electric generating facilities proposed for construction. Those facilities "designed or capable of operating at a gross capacity of 80 megawatts or more" must submit a licensing application to the EFSB. Section 42–98–3. Alternatively, facilities that fall below the eighty-megawatt threshold must adhere to the piecemeal permitting process involving state and local licensing agencies. Both the EFSB and the state licensing agencies have exclusive jurisdiction. Thus, if an application to construct and site an energy facility is properly before the EFSB, no state or local licensing agency will hold concurrent jurisdiction, and vice versa. See §§ 42–98–2(D) and 42–98–12(A).

Newbay intends to construct and operate a combined-cycle cogeneration facility immediately east of the Seekonk River in East Providence. Newbay has a contractual commitment to sell approximately 72.5 megawatts of electricity to the New England Power Company and eleven member utilities of the Massachusetts Municipal Light Company. Newbay also plans to sell process steam to a manufacturing plant that is to be built adjacent to Newbay's plant. Realizing that its facility would require less than 7.5 megawatts of electricity for internal purposes, Newbay contends that it is not required to obtain a license from the EFSB because the facility's gross electric capacity falls below the siting act's 80–megawatt jurisdictional threshold. Relying on this premise, Newbay began its long journey down the path of state and local licensing proceedings. Suddenly, as Newbay neared the end of its tumultuous licensing odyssey, the EFSB decided sua sponte to conduct an investigatory hearing to determine whether Newbay's proposed facility was within the EFSB's exclusive jurisdiction. In response, Newbay sought and obtained a preliminary injunction from the Superior Court enjoining the EFSB's jurisdictional proceeding. The injunction was vacated by this court, which decision thereby allowed the hearing to go forward.

See Newbay Corp. v. Malachowski, 599 A.2d 1040 (R.I.1991).

After conducting an extensive five-day hearing that included four days of testimony and a day of public comment, the EFSB released a Report and Order finding that the total power capacity of Newbay's proposed facility exceeded eighty megawatts. In reaching this conclusion, the EFSB majority interpreted Newbay's total electric generating capacity to include all forms of energy produced by the facility, including the steam that Newbay had contracted to sell. According to the EFSB, the energy content of the steam must be measured in British thermal units (Btus) and then converted by an arithmetic formula to an equivalent megawatt value. Adding the steam's megawatt value to the facility's electric generating value, the EFSB concluded that the gross generating capacity of Newbay's facility exceeded eighty megawatts. The EFSB also dismissed Newbay's argument that the addition of several design criteria prevented the facility from exceeding the siting act's eighty-megawatt jurisdictional threshold. Although acknowledging that such refinements and changes would curtail the facility's gross capacity, the EFSB majority concluded that "it is appropriate that we measure electric generating capacity for jurisdictional purposes as of the date our investigation began." In other words, since these limiting controls were not a part of Newbay's design when the EFSB began its investigation on July 30, 1991, the EFSB found the facility's electric output capable of exceeding eighty megawatts. Accordingly the EFSB directed Newbay to file an application to the EFSB for siting approval pursuant to § 42–98–3(A). The EFSB chairman, James J. Malachowski (Malachowski), dissented from the majority's decision. He claimed that the majority erred by including the energy value of steam in calculating the gross electrical capacity of Newbay's proposed facility. Malachowski opined that the majority's inclusion of steam was inapposite to the siting act's plain meaning and was nothing more than "an opportunistic and selective attempt to

stretch the jurisdictional power of the Board."

On May 20, 1992, Newbay filed a petition for the issuance of a writ of certiorari, seeking reversal of the EFSB's decision. This court then issued an order requiring Newbay to show cause why we should not quash the writ as interlocutory. After hearing oral arguments, we issued an order on September 17, 1992, discharging the previous show cause order and setting the case for full argument. *See Caithness RICA Limited Partnership v. Malachowski*, No. 92–276–M.P. (order filed Sept. 17, 1992).

Notwithstanding the extensive media coverage and political hype surrounding this case, the task before this court is straightforward and simple. We must decide whether the EFSB, pursuant to its authority under the siting act, was correct in holding that Newbay's facility was within its jurisdictional grasp. It is a basic tenet of statutory construction that if the language of a statute is "clear on its face, then the plain meaning of the statute must be given effect." *Gilbane Co. v. Poulas*, 576 A.2d 1195, 1196 (R.I.1990). In the absence of equivocal or ambiguous language, the wording of the statute must be applied literally and cannot be interpreted or extended. *State v. LaPlume*, 118 R.I. 670, 683, 375 A.2d 938, 944 (1977). We have consistently prevented state administrative agencies from expanding their jurisdiction through strained interpretations of unambiguous statutes. *See City of East Providence v. Public Utilities Comm'n*, 566 A.2d 1305, 1308 (R.I.1989).

Applying this standard of statutory construction, we find the siting act's language to be plain and unambiguous. As stated in § 42–98–4, "No person shall site, construct or alter a major energy facility within the state without first obtaining a license" from the EFSB. A "major energy facility" is defined as a facility "for the *generation of electricity* designed or capable of operating at a gross capacity of 80 megawatts or more." G.L.1956 (1988 Reenactment) § 42–98–3(A).[1] (Emphasis added.) By expressly stating that the siting act applies only to electric generating facilities, the General Assembly clearly indicated that the EFSB's jurisdiction would be premised on a facility's *electric* output. Nowhere in the siting act does the General Assembly remotely imply that the energy value of steam should be arithmetically converted into megawatts and included in determining a facility's gross electric generating capacity.

The EFSB, in propounding its steam theory, relied primarily upon the opinion of expert engineering witness Professor Peter Richardson (Richardson). Richardson opined that different forms of energy can be stated in common measurement units. He stated that, in a technical scientific sense, the thermal energy of steam can be measured in megawatts. From this theoretical truism, the EFSB jumps to the conclusion that the General Assembly, in providing a jurisdictional threshold of eighty megawatts, necessarily requires the inclusion of a cogeneration plant's steam output in calculating its electric generating capacity. We believe that Richardson's theoretical and academic approach runs directly afoul of the plainly worded siting act. Furthermore, the plain meaning of the word "megawatt" confirms the siting act's clear and unambiguous meaning. Experts from

1. General Laws 1956 (1988 Reenactment) § 42–98–3(A) was amended by the General Assembly in 1990. P.L.1990, ch. 321, § 1. This amendment lowered the jurisdictional threshold to forty megawatts. The General Assembly indicated that this forty-megawatt threshold

"shall operate prospectively and shall not apply to any electric cogeneration facility capable of operating at a gross capacity of more than 40 megawatts but less than 80 megawatts which, prior to May 30, 1990, has applied to the department of environmental management for an air quality permit or approval; provided, however, that, notwithstanding any such application, this chapter shall apply to any facility capable, at any time, of operating at a gross capacity of 80 megawatts or more." Section 42–98–19 (See complier's notes), as enacted by P.L.1990, ch. 321, § 2.

As the EFSB's majority stated in its "findings of facts," Newbay had applied to DEM for an air quality permit or approval before May 30, 1990. Thus, we need not apply the 1990 amendment to Newbay's proposed facility.

both sides explained that the thermal-energy content of steam is measured in Btus, pound per hour, or pressure temperature, while the term "megawatt" is commonly understood to be a measurement of electricity. Neither the EFSB nor Newbay's opponents presented any evidence, other than Professor Richardson's academic theory, that the term "megawatt" can be interpreted as anything other than a measurement of electricity. Additionally, this court is unfamiliar with any legislation or case law that construes the term "megawatt" to be a measurement of steam's energy value. We are therefore unpersuaded by the EFSB's steam theory. We find that such an interpretation of the siting act ignores the statute's plain and ordinary meaning in an attempt to impermissibly expand the EFSB's jurisdiction to encompass Newbay's facility.

■ Furthermore, the record before the EFSB was replete with references to mechanical constraints that would shut down the facility's generator if it exceeded seventy-nine megawatts. Two of Newbay's expert witnesses testified at length about the multiple design criteria that will physically prevent the facility from generating more than seventynine megawatts of electricity. Those design criteria include (1) the field current excitation portion of the generator, which will be designed and constructed to render the facility physically incapable of generating in excess of seventy-nine megawatts of electricity, (2) the feed water pump to the boiler, which will be designed and constructed to render the boiler incapable of raising a sufficient amount of steam to permit the generator to produce more than seventy-nine megawatts of electricity, (3) the generator lead and transformer, which will limit the facility's output to a maximum of seventy-nine megawatts of electricity, (4) a "choked flow" at the last stage of the turbine, which will prevent the velocity of steam going through the turbine to increase so as to produce more than seventy-nine megawatts of electricity in changing ambient conditions, and (5) a centralized system of limiters and governors, which will act as an overall fail-safe mechanism to ensure that the plant is not tripped

and shut down by the other integral design constraints. The EFSB does not contest the fact that such limiting mechanisms would effectively prevent the facility from exceeding the jurisdictional limit. Rather the EFSB circumvented the merit of these design criteria by measuring the facility's generating capacity as of the date the EFSB's jurisdictional investigation began. The EFSB stated that "while refinements and changes in Newbay's plans since January 5 [of 1992] may have reduced the electric generating capacity below the jurisdictional limit, * * * the facility was capable of exceeding the threshold * * * when our investigation began in July, 1991."

We disagree with the EFSB's decision to evaluate the facility's electric generating capacity as of July 30, 1991. Adopting the EFSB's reasoning would enable the EFSB to assert jurisdiction over a facility that Newbay did not submit for licensing review and no longer intends to construct. If we affirm the EFSB's preliminary-design theory, we would be permitting the EFSB to review and license an electric generating facility that, according to its updated design, falls below the eighty-megawatt jurisdictional threshold. The siting act clearly prohibits such a result. The EFSB has no authority to license facilities that are not "major energy facilities." Granting the EFSB such authority would divest other permitting authorities of their lawful jurisdiction. *See* §§ 42–98–1, 42–98–2, and 42–98–4.

We therefore find that the EFSB should have evaluated the facility's gross electric capacity as of the time of the EFSB's jurisdictional hearing. As of that time we conclude that the inherent design limitations would prevent Newbay's facility from generating eighty megawatts of electricity or more. The EFSB's assertion that a jurisdictional design theory can be based on an outmoded preliminary design, particularly when the developer was unaware that its preliminary design would have dispositive jurisdictional consequences, we find to be nothing more than an attempt to evade the siting act's jurisdictional limits.

Relying on the disposition of the preceding issues, we need not reach the merits of the other issues raised by Newbay.

For the reasons heretofore stated, we believe that the EFSB misconstrued the siting act's clear and unambiguous language and, as a result, erred in asserting jurisdiction over Newbay's proposed facility. We therefore grant Newbay's petition for certiorari. The EFSB's Report and Order of May 15, 1992, is hereby quashed, and the papers in this case are remanded to the EFSB with our decision endorsed thereon.